UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASALLE TOWN HOUSES COOPERATIVE
ASSOCIATION, *et al.*,

       Plaintiff,

                                       Case No.  12-cv-13747

vs.                             HON. GERSHWIN A. DRAIN

CITY OF DETROIT, acting through its
DETROIT WATER AND SEWERAGE
DEPARTMENT,

       Defendant.

_____/

## ORDER DENYING PLAINTIFFS' MOTION TO STRIKE AND EXCLUDE OPINIONS DEFENDANT OFFERS FROM BART D. FOSTER [#69] AND CANCELLING MAY 5, 2015 HEARING

## I.    INTRODUCTION

Presently before the Court is the Plaintiffs' LaSalle Town Houses Cooperative, Nicolet Town Houses Cooperative Association, Lafayette Town Houses, Inc., Joliet Town Houses Cooperative and St. James Cooperative and certified class, Motion to Strike and Exclude Opinions Defendant Offers from Bart D. Foster, filed on March 20, 2015.  Defendant, City of Detroit, acting through its Detroit Water and Sewerage Department, filed a Response in Opposition on April 6, 2015.  Plaintiffs filed a Reply

-1-

brief on April 13, 2015.  Upon review of the parties' briefing, the Court finds that oral argument will not aid in the resolution of this matter.  Accordingly, the Court will resolve Plaintiffs' present motion on the briefs and will cancel the May 5, 2015 hearing.  *See* E.D. Mich. L.R. 7.1(f)(2).  For the reasons that follow, the Court will deny Plaintiffs' Motion to Strike.

## II.    FACTUAL BACKGROUND

Plaintiffs represent a class consisting of apartment buildings, cooperatives, townhouses and condominiums with five or more residential units.  Plaintiffs filed the instant action challenging Defendant's classification of Plaintiffs' properties as commercial for purposes of billing for water and sewage removal services.  Plaintiffs maintain that Defendant's classification scheme runs afoul of the Equal Protection clause because there is no rational reason justifying the application of a higher commercial rate to residential structures with five or more units and not structures with less units or single family dwellings.

Defendant listed Mr. Foster as an expert in its Witness List, which was filed with the Court on July 31, 2014.  Discovery in this matter ended on October 31, 2014. The parties filed their respective Motions for Summary Judgment in late January of 2015.  Defendant submitted Mr. Foster's Declaration in support of its Motion for Summary Judgment.

## A.    Mr. Foster's Education and Background

Mr. Foster's experience includes "almost thirty years of performing financial and engineering management consulting services, specializing in services for municipal utility clients in the United States." *See* Def.'s Resp., Ex. A at ¶ 4.[1]  Mr. Foster holds two degrees from the University of Kansas: (a) a Bachelor of Science in Mechanical Engineering, which he received in 1983, and (b) a Master of Business Administration, with a concentration in Finance, which he received in 1985. *Id*. at ¶ 3.

Mr. Foster worked for a large consulting practice serving utility and other municipal clients in the United States for nearly twenty years. *Id*. at ¶¶ 3, 4, 5 and 6. In 2004, he founded The Foster Group LLC, a consulting firm that provides finance and engineering management consulting services to a large number of municipal clients.  *Id*. at ¶ 5.  In the three decades he has been involved with assisting municipalities and their utilities, Mr. Foster has served at least ten different cities, townships, counties and regional authorities in Michigan. *Id*. at ¶ 7.  In addition to Defendant, Mr. Foster has provided services for the cities of Lansing, Flint, Ann Arbor, Grand Rapids, Kalamazoo, Wyoming, Holland, as well as the Southeastern

---

[1]  Defendant did not include Mr. Foster's curriculum vitae along with his Declaration, however he did address his education and experience in his Declaration.

Oakland County Water Authority.  *Id.*

His professional experience has involved management of rate design studies for water and wastewater utilities and the management of financial planning and cost of service mechanisms for those utilities.  *Id.*  He has also been an advisor to the executives of the municipalities to provide evaluations of critical business issues that will affect those governmental utilities, has provided reports in conjunction with the issuance of municipal revenue bonds and has performed a host of other analytical, evaluative, development, management and design functions for those utility entities. *Id.*

Mr. Foster has consulted on water and wastewater rate and finance issues for the Defendant "on a continuous basis since 1985."  *Id.* at ¶ 8.  He has "detailed personal knowledge about the methodology that [Defendant] employed to set rates for the entire Case Period," or the time period during which Plaintiffs are claiming damages, August 1, 2006 through July 31, 2015.

### B.   Defendant's Classification Scheme

Defendant "has tens of thousands of customers . . . ."  *Id.* at ¶ 12.  Because of this number, Defendant cannot set individualized rates for each customer that reflect the customer's usage of Defendant's water and sewage removal services.  Defendant therefore "(a) groups its customers into customer classes and subclasses (b) employs

-4-

averages or other factors representative of the class or subclass as a whole for various cost-related characteristics of those customers." *Id*. Defendant classifies Plaintiffs and the respective class as commercial properties for rate making purposes. *Id*. at ¶ 16. Specifically, Defendant's practice has been to include properties containing (a) four or fewer residential units in the "residential" customer class and (b) five or more residential units that were not individually metered for water service in the commercial customer class for rate making purposes. *Id.* This classification scheme defining residential customers as any dwellings with four units or less and commercial customers as five or more unit dwellings was first used in July of 1984. *See* Plfs.' Mot., Ex. 1. The 1984 adoption of this classification scheme occurred "[a]fter reviewing Commercial Division records and Rules of the Zoning Commission, Planning Commission, and the Assessor's Office . . . ." *Id*.

## III.   LAW & ANALYSIS

A party offering an expert's opinion bears the burden of establishing the admissibility of such opinion by a preponderance of the evidence. *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 344, 251 (6th Cir. 2001). Expert testimony is admissible only if it satisfies the requirements of Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion

or otherwise if:

> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court must determine whether the expert's testimony meets three requirements: (1) the expert witness must be qualified by "knowledge, skill, experience, training or education," (2) the proffered testimony is relevant and "will assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) the testimony is reliable in that it is based on scientific, technical or other specialized knowledge. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008).

Plaintiffs argue that Mr. Foster's declaration should be stricken because some of his opinions are based on evidence not in the record and some of his opinions are legal conclusions rather than expert opinion. Specifically, Plaintiffs move to strike paragraphs eleven through twenty-five (11-25) of Mr. Foster's Declaration.

Plaintiffs first complain that Mr. Foster has not attached or referenced specific records, studies, data or surveys in support of his opinions. They further complain that Mr. Foster was not a consultant at the time the Defendant adopted its current

-6-

classification scheme.

Contrary to Plaintiffs' argument, Mr. Foster has extensive personal knowledge of the annual rate system employed by Defendant, which renders his opinion reliable and admissible. Rule 702 of the Federal Rules of Evidence does not require that an expert's foundational information be attached to his report or opinion, nor that it be admitted or admissible. In fact, Rule 703 of the Federal Rules of Evidence states in relevant part:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703.

Here, Mr. Foster's opinions are based on his own personal knowledge of, and experience with, the Defendant's rate setting methods in each of the years since 1985. Each year, he has been responsible for the Defendant's water and wastewater rate studies that have served as the basis for Defendant's rates and charges each year during the Case Period. *See* Def.'s Resp., Ex. 1 at ¶ 10. As such, he has "detailed personal knowledge about the methodology that Defendant employed to set rates for the entire Case Period." *Id.*

Mr. Foster's qualifications are analogous to those of the expert in *United States*

*v. Jones*, 107 F.3d 1147, 1161 (6th Cir. 1997), whose opinion was admitted by the trial court and affirmed by the Sixth Circuit Court of Appeals. That expert's "various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony in the case," rendered his testimony reliable for *Daubert* purposes. Plaintiffs' reliance on *Tamraz v. Lincoln Electric Co.*, 620 F.2d 665 (6th Cir. 2010) is misplaced because that case is distinguishable from the circumstances here.

In *Tamraz*, the Sixth Circuit Court of Appeals concluded that the district court exceeded its discretion in admitting a doctor's testimony that the defendant's products triggered manganese-induced parkinsonism in the plaintiff-welder. *Id.* at 667. The Tamraz court found that the doctor's diagnosis "was at most a working hypothesis, not admissible scientific knowledge." *Id.* at 670. The expert "barely explained" why he believed manganese caused the plaintiff's symptoms, as well as conceded that "speculation led him to guess that Tamraz had an underlying predisposition to Parkinson's disease" and admitted he knew of no studies finding a link between manganese and Parkinson's disease. *Id.* In conclusion, the *Tamraz* court found that "nothing in his testimony suggests the sort of knowledge . . . that the Rules require–only speculation, which is generally inadmissible." *Id.* at 671.

Unlike the expert in *Tamraz*, Mr. Foster is not a scientific expert, rather Mr.

-8-

Foster is qualified based on his extensive personal knowledge of the rate-setting process of Defendant.  Mr. Foster is not speculating about the Case Period years, he was involved in the rate setting process itself.  Mr. Foster also relies on generally accepted practices of water utility rate-making.

Plaintiffs complain that Defendant did not provide discovery concerning the "Commercial Division records and the Rules of the Zoning Commission, Planning Commission, and the Assessor's Office" which were relied upon when the Defendant first adopted its classification scheme in 1984.  However, the relevant portion of Mr. Foster's opinion is based on his experience with rate-setting in the years of the Case Period.  That the Defendant is unable to come forward with decades old records does not diminish Mr. Foster's first hand knowledge of his experience as a consultant for the Defendant.  Moreover, Plaintiffs complaints about Defendant's discovery responses are disingenuous considering the Plaintiffs never filed a Motion to Compel with the Court.  Plaintiffs place great emphasis on the 1984 memorandum setting out Defendant's classification scheme, however they fail to acknowledge that Defendant's rate-setting process is annual.  *See* Def.'s Resp., Ex. 1 at ¶¶ 10-11. Plaintiff's complaints concerning Mr. Foster's opinions are proper for cross examination but do not warrant exclusion under Rule 702.

Plaintiffs also complain that Mr. Foster's opinions are legal conclusions.

Specifically, Plaintiffs assert the following statements are improper legal conclusions:

> • DWSD is required by law to (a) collect, treat and dispose of storm water . . . and (b) charge customers responsible for the storm water flows

> • Using water meter diameters in this way was and is a common and reasonable rate-making practice primarily because water meter sizes correlate reasonably well with Impervious Facts that determine the volume of storm water runoff from the property and, accordingly DWSD's associated costs.

*Id*. at ¶¶ 14, 25.  Plaintiffs argue that Mr. Foster's statements imply that the classification and rate-making scheme used by Defendant is mandated by law.

Plaintiffs have misconstrued the meaning of Mr. Foster's statements. Moreover, his statements are not improper legal conclusions, rather they describe irrefutable legal requirements that control municipal utility design and rate-making. The Clean Water Act requires municipalities such as Defendant to collect, treat and dispose of storm water that meets the sewer system.  In fact, the Defendant was sued in 1977 for failing to comply with the Act's requirements.  *See* 33 U.S.C. § 1284(b)(1)(A), 1284(b)(2); *see also United States v. City of Detroit*, 77-cv-71100, 1989 U.S. Dist. LEXIS 15202, *10 (E.D. Mich. Nov. 7, 1989) (noting that the City was sued in 1977 for allegedly violating the Clean Water Act by allowing its waste water to pollute the Detroit and Rouge Rivers and that a new permit regulates the treatment Detroit must give its rain day flows to comply with the Act).

Additionally, the Michigan Revenue Bond Act prohibits utilities from providing free service to any user of the utility system. MICH. COMP. LAWS § 141.118. Moreover, the Sixth Circuit has explained why Defendant is required by law to charge its customers for storm water disposal in *City of Detroit v. State of Michigan*, 803 F.2d 1411, 1421 (6th Cir. 1986) ("The drainage and treatment of storm water from [Wayne County Road Commission's] roads into the City of Detroit's sewer system constitutes a 'service rendered . . . [and] [t]he City of Detroit has a statutory right to charge WCRC for 'the reasonable cost and value' of this service.") In any event, the description of the legal requirement to dispose of, and charge for, storm water does not equate to a statement about the method for charging for storm water services.

Lastly, Mr. Foster is qualified to offer his opinion that it is common and reasonable to use water diameter as a basis for rate setting for those customers that Defendant did not have property-specific information on. His thirty years of experience working for municipal utilities, such as the Defendant, renders him knowledgeable about rate design and cost allocation that is mandated by law. Such a statement is not an improper legal conclusion.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike and Exclude Opinions Defendant Offers from Bart D. Foster [#69] is DENIED.

SO ORDERED.

Dated: April 20, 2015                    /s/Gershwin A Drain
                                          GERSHWIN A. DRAIN
                                          UNITED STATES DISTRICT JUDGE