UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASALLE TOWN HOUSES
COOPERATIVE ASSOCIATION,
NICOLET TOWN HOUSES
COOPERATIVE ASSOCIATION,
LAFAYETTE TOWN HOUSES, INC.,
JOLIET TOWN HOUSES
COOPERATIVE ASSOCIATION,           Case No. 12-cv-13747
ST. JAMES COOPERATIVE,          HON. GERSHWIN A. DRAIN

    Plaintiffs,

v.

CITY OF DETROIT,

    Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [#61] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#64]**

**I. INTRODUCTION**

On August 23, 2012, Plaintiffs LaSalle Town Houses Cooperative Association, Nicolet Town Houses Cooperative Association, Lafayette Townhouses, Inc., Joliet Town Houses Cooperative Association, and St. James Cooperative (collectively "Plaintiffs") filed the instant action. Plaintiffs are various residential housing cooperatives with five or more units, located within the city of Detroit.

Plaintiffs allege that Defendant, the City of Detroit ("City"), acting through its Water and Sewerage Department ("DWSD"), arbitrarily overcharges them for water drainage services.

Plaintiffs assert that Defendant charges them the commercial rate for drainage services as opposed to the residential rate. Plaintiffs further assert that the residential rates and the commercial rates are substantially different for structures with water meters that are either one-and-a-half or two inches in size.

Plaintiffs filed this class action suit under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article 1, § 2 of the Michigan constitution.[1] They contend that there exists no rational basis for charging the commercial rate to housing cooperatives with more than five residential units.

Presently before the Court are the parties' cross-motions for summary judgment.[2] ECF Nos. 61, 64. Both parties contend that they are entitled to summary judgment on Plaintiffs' claim for violation of the United States and Michigan Constitutions. For the reasons that follow, the Court has determined that both summary judgment motions will be denied.

## II. FACTUAL BACKGROUND

### A. Factual History

Plaintiffs are owners of various residential cooperatives within Detroit city limits. Plaintiffs' housing cooperatives contain more than four residential units per building; specifically, some of the named plaintiffs operate six residential units, and the remaining named plaintiffs operate buildings with 10 residential units. Moreover, while the buildings are not single family residential dwellings, they are purely residential in nature.

Defendant is the City of Detroit. The City provides water and sewerage services to residential, commercial, and industrial buildings and facilities. Wastewater services are provided

---

[1] On March 3, 2014, the Court granted Plaintiffs' motion to certify the class. ECF No. 47.

[2] The Court advises that the parties adhere to Michigan Federal Court Rule 5.1(a)(3). The Rule states that "[e]xcept for standard preprinted forms that are in general use, type size of all text and footnotes must be no smaller than 10-1/2 characters per inch (non-proportional) or 14 point (proportional).

on a retail basis within Detroit city limits. When providing these services, the City acts through its Detroit Water and Sewerage Department ("DWSD").

Various federal laws and local ordinances govern the City's responsibility to manage the treatment of wastewater. The Clean Water Act and its Michigan counterpart, the Department of Environmental Quality, for example, require the City to treat and manage storm water runoff. Storm water runoff is water that cannot be absorbed into the ground. In addition, Detroit City Code Section 56-3-8(b) requires that storm water runoff be discharged into public sewers.

On December 3, 1984, the city issued a DWSD inter-departmental memorandum ("1984 Memorandum"). The memorandum currently remains in effect. The 1984 Memorandum classified DWSD retail users in six ways. DWSD accounts are accordingly classified as: residential, commercial, industrial, housing, municipal, or schools. Pls.' Mot. Summ. J., Ex. 1. "Residential" classifications are defined as "one, two, three, or four unit dwellings." Pls.' Mot. Summ. J., Ex. 1. "Commercial" classifications are those buildings defined as a "store, hotel, apartment building, restaurant, gas stations, warehouse, car wash, office building, beauty school, etc." Pls.' Mot. Summ. J., Ex. 1.

Plaintiffs are consumers of DWSD. The individual residential units of Plaintiffs' cooperatives do not have individual water meters. Instead, on average, the larger cooperatives have four or five water meters that service an entire building. The majority of these meters are one-and-a-half to two inches in size. Accordingly, the City classifies Plaintiffs' cooperatives as "commercial" structures and consequently charges Plaintiffs at a commercial rate rather than a residential rate for its water and sewage removal services.

DWSD sets rates for water and wastewater services annually for the rate year. The "rate year" begins on August 1 and ends on July 31 of the following year. Plaintiffs now challenge

wastewater rates in effect from August 1, 2006 until July 31, 2015 (the "case period"). In particular, Plaintiffs challenge the differential between residential and commercial monthly drainage charges for structures with meter sizes of one-and-a-half inches and two inches. Records show that there exist a significant differential in charges for residential and commercial properties, for only these stated meter sizes. Pls.' Mot. Summ. J., Ex. 1. For example, in August 2012, residential property owners were charged $13.79 while non-residential property owners were charged $129.15. Pls.' Mot. Summ. J., Ex. 1.

### B. Procedural History

Plaintiffs filed the immediate Complaint on August 23, 2012, in this Court. During the time following the filing of the Complaint, the City of Detroit filed for municipal bankruptcy. Consequently, the City became subject to the jurisdiction of the United States Bankruptcy Court, and the Court's automatic stay applied to the present proceeding. On July 29, 2013, the Court, accordingly, entered an Order staying and administratively closing the case. ECF No. 36.

On December 18, 2013, the Bankruptcy Court granted Plaintiffs' motion to lift the automatic stay "for the limited purpose of pursuing class certification, establishing liability, and seeking to enjoin DWSD from charging improper rates." Pls.' Mot. Summ. J., Ex. 3. In compliance with the Bankrtuptcy Court's December 13 Order, on March 3, 2014, this Court entered an Order granting Plaintiffs' motion to certify the class. ECF No. 47. The class consists of:

> All entities or individuals owning, or acting for owners of, buildings, apartment buildings, townhouses, housing cooperatives and condominiums with multiple units and utilized for residential purposes whom and which have been charged at a commercial rate by the City of Detroit and/or the Detroit Water and Sewerage Department for water and sewerage and component services with the time period at least six years prior to the filing of this action

4

>through the date of final judgment or such longer amount of time as may be allowed by law.

ECF No. 47. To date, Defendant has produced a list of 2,500 apartments.

## III. LAW AND ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The party seeking summary judgment "bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. The evidence and all reasonable inferences then must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). The evidence presented must be such on which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48

(emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B. Equal Protection Clause – Legal Standards

#### 1. Standards for the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution

The Equal Protection Clause of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The provision applies to both state and local governments. *Olympic Arms v. Magaw*, 91 F.Supp. 2d 1061, 1070 (E.D. Mich. 2000).

Equal protection principles are violated when the government treats differently people who are alike. *See Peoples Rights Org., Inc. v. City of Columbus,* 152 F.3d 522, 531 (6th Cir. 1998). The government, therefore, may not inappropriately classify people. *Olympic Arms*, 91 F.Supp. 2d at 1070.

"The Equal Protection Clause prohibits states from making distinctions that either (1) burden a fundamental right, (2) target a suspect classification, or (3) intentionally treat one

differently from others similarly situated without any rational basis for the difference." *Bench Billboard Co. v. City of Toledo*, 499 F. App'x 538, 547 (6th Cir. 2012) (citing *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). Furthermore, "[w]hen a statute or ordinance uniquely impacts adversely a suspect class or invades a fundamental right, the rigorous strict scrutiny standard will apply, but when it does not the ordinance is tested under the rational relationship standard." *Mount Elliott Cemetery Ass'n,* 171 F.3d 398, 406 (6th Cir. 1999) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). Here, both parties agree that the appropriate standard of review is the rational basis test.

To survive rational basis scrutiny, "the statute need only be 'rationally related to legitimate government interests.'" *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (quoting *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007)). Under the rational relationship standard, the regulation "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). In particular, "'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.* at 747 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). A statute on equal protection grounds will therefore not be struck down "'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). Yet, the Government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."

7

Plaintiffs may show that a government action lacks a rational basis "by negativing every conceivable basis which might support the government action." *Id.* (quoting *Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006)). Plaintiffs may also demonstrate a lack of rational basis "by demonstrating that the challenged government action was motivated by animus" or ill-will. *Id.*; *see also Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005), *Klimik v. Kent Cnty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004), *Bower v. Vill. Of Mount Sterling*, 44 F. App'x 670, 677-78 (6th Cir. 2002). However, "under rational relationship review, 'the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process.'" *Olympic Arms*, 91 F.Supp. 2d at 1071 (quoting *Mount Elliott Cemetery Ass'n v. City of Troy,* 171 F.3d 398, 406 (6th Cir. 1999)); *see also Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 299 (6th Cir. 1997) ("In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."). The rational basis standard of review recognizes that "'equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.'" *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005). "It is 'entirely irrelevant for constitutional purposes' whether the plausible reason in fact motivated the policymaker." *Young v. Mahoning Cnty., Ohio*, 418 F.Supp. 2d 948, 961 (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. at 315).

Under rational basis review, "[l]egislative choice is [thus] not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. at 307; *see also TriHealth, Inc.*, 430 F.3d at 790

("[Defendant] has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid..."").

Nor can a classification "be deemed to lack rational justification simply because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *TriHealth, Inc.*, 430 F.3d at 790-91 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). This rule preserves the legislative branch's "rightful independence and its ability to function." *Id.* at 308. Therefore, an equal protection violation can only be made when a government's actions are shown to be irrational. *See id.* at 791 (citing *Warren*, 411 F.3d at 710).

### 2. Standards for the Equal Protection Clause of the Michigan Constitution

Relevant to this discussion is Article 1, § 2 of the Michigan Constitution of 1963, which also grants the right of equal protection under the laws. Under Michigan law, the question of whether a particular enactment violates equal protection for want of proper classification is determined by a two-part inquiry. First, the Court must determine if the enactment's classifications are based on "natural distinguishing characteristics," and if so, whether they bear a reasonable relationship to the object of the enactment. *Alexander v. City of Detroit*, 392 Mich. 30, 43 (1974). Second, the Court must evaluate whether all persons of the same class are included or affected alike, or whether immunities or privileges extended to an arbitrary or unreasonable class while denied to others of like kind. *Id.*

### C. Parties' Cross-Motions for Summary Judgment

The City of Detroit charges residential properties in one of two manners for its wastewater services: as residential or commercial. The two classes are charged at different rates if the water meter sizes are either one-and-half inches or two inches. For example, in August 2012, a single-family residence was charged at the residential rate, resulting in a monthly charge

9

of $13.79. In contrast, a residential structure with more than four units with the same meter size was charged at the commercial rate, resulting in a $129.15 charge. For this reason, Plaintiffs contend that the monthly charge for residential consumers classified as commercial amounts to a markup. Plaintiffs consequently argue that these categorizations are arbitrary because the classes are not defined by actual residential or nonresidential use, despite the monikers provided by the City.

Presently before the Court are the parties' cross-motions for summary judgment. Plaintiffs challenge the constitutionality of Defendant's assessment of monthly sewerage charges for residential properties that are classified as "commercial" according to the 1984 Memorandum.

The issue to be determined by the Court is narrow in scope. Particularly, the parties dispute only whether the City's differing monthly charges for commercial and residential properties, with one-and-a-half or two inch water meter sizes, violate the United States and Michigan Constitutions.

Plaintiffs allege that charging commercial rates to residential dwellings with five or more units violates the equal protection clauses of both Constitutions, arguing that the City's charges are not rationally related to the City's objective. The City, on the other hand, argues that its objective—to ensure that "parties responsible for every type of property pay their fair share of the cost of treating the runoff caused by that property"—is constitutionally valid. Def.'s Resp. to Pls.' Mot. Summ. J., at 11. Accordingly, the City asserts that owners of residential properties with more than four units should be required to pay higher rates; specifically, the City asserts that storm water runoff draining from such properties typically requires more treatment, and therefore warrants higher rates.

The Court finds that neither party is entitled to summary judgment for the reasons outlined below.

### 1. Plaintiffs' Federal Equal Protection Claim

In this case, the Court must determine whether the City's water drainage rates deny Plaintiffs equal protection of the laws under the United States Constitution. In particular, the parties dispute whether the City's storm water drainage rates, charged to the owners of residential building structures classified as "commercial," violate the appropriate standard of review. After reviewing the arguments presented, the Court has found that neither party is entitled to summary judgment on this issue.

The parties agree that rational basis scrutiny is the appropriate standard of review. To prevail on a rational basis standard, Plaintiffs must therefore show that the City's rate for residential dwellings with five or more units is rationally related to its interest in equally proportioning fees for its sewerage services.

The City argues that its drainage rates are rationally related to its goal to ensure that property owners pay their fair share of the cost of treatment of storm water runoff. The City relies heavily on the declarations of Bart D. Foster ("Mr. Foster") to further demonstrate that its interest in fair apportionment is rationally related to its system of rates and charges.

Mr. Foster has served as a water and wastewater financial and rate consultant for DWSD since 1985. Foster Decl. ¶ 8. He attests that he has been primarily responsible for the DWSD water and wastewater rate studies that have served as the basis for DWSD's rates from August 1, 2006 to July 31, 2015. Foster Decl. ¶ 10. In great detail, Mr. Foster describes DWSD's drainage charge ratemaking methodology. *See* Foster Decl. ¶¶ 15-25. Mr. Foster specifies the significant role that "impervious factors" play into setting the rates. *See* Foster Decl. ¶¶ 15-25.

The City, through the testimony of Mr. Foster, explains that residential properties with more than four units typically have a greater percentage of "impervious surfaces." Impervious surfaces are land areas "from which storm[ ]water runs off into DWSD's sewers as opposed to soaking into the ground." Foster Decl. ¶15d. Parking lots, driveways, sidewalks, larger roofs, or properties with otherwise excess pavement, from which storm water is more likely to run off into the City's sewers, are illustrative of impervious surfaces. The City asserts that properties with higher "impervious surfaces," such as Plaintiffs' cooperatives, therefore require more treatment.

The City, in contrast, asserts that single-family residences and buildings with four or less residential units, typically have "lower imperviousness." In other words, low occupancy residential properties typically include relatively large lawn surfaces. Storm water consequently soaks into the ground instead of flowing into sewers, and therefore, the City does not need to treat such water.

The City further asserts that it accounts for this "impervious factor" when determining monthly charges. *See* Foster Decl. ¶¶ 18-21, 25. The City presumes that, in its calculation of monthly charges, water meter size is an indicator of the attributes of a property, including imperviousness. *See* Foster Decl. ¶¶ 20-21. For example, the City explains that larger water meters, including those more than two inches in size, are usually found on properties with higher impervious factors—i.e., have additional structures or coverings over the ground—regardless of classification. *See* Foster Decl. ¶¶ 20-22. Such properties thus have surfaces that are less likely to absorb water. As mentioned above, water that is not absorbed will inevitably run into the City's storm sewers and subsequently will require treatment provided by the City. In contrast, those properties with water meters less than one-and-a-half inches in size have lower impervious

factors. *See* Foster Decl. ¶¶ 20-22. The City therefore asserts that the disparate charges are rooted in a rational basis because the relationship between impervious factors and water meter size are embedded in its ratemaking methodology.

Plaintiffs, however, are dissatisfied with the arguments that the City advances. Plaintiffs take issue with the City's explanation of how monthly rates are borne. As an initial matter, Plaintiffs contend that it does not matter how much water flows through the City's sewerage system; what matters is that residential and commercial users, with one-and-a-half to two-inch meters, consume the same amount of water.

Plaintiffs contend that, despite Mr. Foster's declarations, the City does not structure its drainage charges with any concern for "imperviousness." Plaintiffs point to the fact that only properties with one-and-a-half and two-inch meters are charged at different rates, depending on the property's class. Pls.' Mot. Summ. J., Ex. 2. Plaintiffs, instead, believe that the City bases its rates in water meter size.

Plaintiffs, therefore, next take issue with the significance that water meter size has on storm water drainage rates. They assert that a disparity in rates between commercial and residential rates only exist when the water meters attached to those properties are one-and-a-half and two inches in size.

Although the City has explained the interrelatedness of imperviousness and water meter size, Plaintiffs have difficulty believing the purported relationship between water meter size and imperviousness. Plaintiffs instead suggest that the City's explanation is a farce because it neither conducted nor produced a study, survey, or analysis to support its rationale for the disparate rates. In the absence of such a study, survey, or analysis, Plaintiffs believe that they are left to conclude that water meter size is the only indicator of the rate disparity. Accordingly, Plaintiffs

conclude that the City's reasons for the differing rates are groundless because establishing storm water drainage rates based on water meter size is arbitrary.

In its summary judgment motion, however, the City contends that its policy for the difference in monthly charges passes constitutional muster. The City argues that "neither federal nor state law requires DWSD's rates to have a mathematically precise relationship to its costs of providing water and sewer services in order to be reasonable[.]" Def.'s Mot. Summ. J., at 19-20. Moreover, the City contends that, despite their disbelief in the City's ratemaking methodology, Plaintiffs have failed to satisfy its burden to demonstrate that the differing monthly charges are irrational under either federal or state rational basis review.

The Court agrees. Under rational basis review, those attacking the rationality of a classification "have the burden to negative every conceivable basis which might support it." *FCC v. Beach Commc'ns*, 508 U.S. at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). In first reviewing Plaintiffs' motion, the Court must determine whether the facts, viewed in a light most favorable to the City, demonstrate a violation of the Equal Protection Clause.

Plaintiffs rely primarily on *Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n*, 488 U.S. 336 (1989), suggesting that it is the most analogous to the case at bar. In West Virginia, the state constitution states that, "'taxation shall be equal and uniform throughout the State, and all property both real and personal, shall be taxed in proportion to its value….'" *Id.* at 338 (quoting W. VA. CONST. art. X, §1).

In evaluating a property owner's tax liability, however, the tax assessor for Webster County, West Virginia, valued real property on the basis of its most recent purchase price. *Id.* at 338. All property was then taxed at 50 percent of the appraised value—"the declared

14

consideration at which the property last sold." *Id.* In effect, real estate taxes were assessed in a manner that produced gross disparities in tax liability owed by owners of comparable properties. 488 U.S. at 340.

The Supreme Court held that the tax assessor violated the Equal Protection Clause "'by subjecting [petitioner] to taxes not imposed on others of the same class,'" and thereby singling out petitioner for discriminatory treatment.'" *Id.* at 343, 345. The Court reasoned that "a State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable." *Id.* at 344 (citing *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 526-27 (1959)). The Court further stated that "'if the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'" *Id.* (quoting *Brown-Forman Co. v. Kentucky*, 217 U.S. 563, 573 (1910)). The Court in *Allegheny*, however, determined that the assessor, by making only minor adjustments for earlier-purchased properties, had not drawn a reasonable distinction between recently-sold property and property which had not been recently sold. *Id.* at 345. By doing so, the Webster County tax assessor violated both the United States and West Virginia Constitutions.

Plaintiffs' factual circumstances, however, differ from the *Allegheny* case. Plaintiffs suggest that *Allegheny* stands for the proposition that courts reject classifications where a government's justifications are "so wildly out of proportion with the harm caused by the classification that no rational legislator would accept them." Pls.' Mot. Summ. J., at 23. The Court supposes that this is one way to interpret *Allegheny's* holding, but it is not necessarily the correct interpretation.

15

As stated above, the Supreme Court in *Allegheny* recognized that states may classify properties and assign a different but reasonable tax burden to those differing classes of property. The Supreme Court in *Allegheny* also determined that the tax assessor's process for assigning tax burdens was rationally related to its goal of assessing properties at their true current value. The Constitution and laws of West Virginia, however, served as a driving force in the outcome of *Allegheny*. The Constitution and the laws of the state of West Virginia required *uniform* taxation according to estimated market value. In *Allegheny*, the Webster tax assessor, on her own initiative, applied state tax law in a manner that not only failed to follow state guidelines, but also resulted in significant disparities in similarly situated properties. This systematic undervaluation of long-purchased properties deprived petitioners of their rights under the Equal Protection Clause. *Id.* at 344-46.

*Allegheny* differs from the matter at-hand in other material respects. The most significant difference is that, in *Allegheny*, the Supreme Court found that the state of West Virginia had drawn no distinction between recently purchased property and non-recently purchased property to warrant the gross disparity in tax burden. In the case at bar, the City offers a reason for the distinction. The City points to the existence of "impervious factors;" the City explains that higher impervious factors warrant higher rates. The City further explains that water meter size is an indicator of imperviousness. Accepting the facts in the light most favorable to the City, Plaintiffs have not satisfactorily demonstrated its entitlement to summary judgment. Simply stating that the City's ratemaking methodology is a "fantasy" does not sufficiently resolve the factual dispute at-hand. In addition, Plaintiffs provide not a scintilla of evidence that the City's differential rates are a product of animus. Plaintiffs have therefore failed to put forth evidence that is so one-sided that it must prevail as a matter of law.

Likewise, in considering the City's summary judgment motion, the Court has also determined that it lacks sufficient evidence to prevail. The City asserts that its goal to ensure fair apportionment of the cost of wastewater services is rationally related to its differential rates between properties classified as residential and commercial. Despite the City's explanation of how the differential rates were created, there remains a material factual dispute concerning the role of "impervious factors" in determining rates. In addition, a material factual dispute exists concerning the relationship between impervious factors and water meter size. For this reason, the City cannot prevail on its motion for summary judgment.

### 2. Plaintiffs' Michigan Equal Protection Claim

Under Michigan law, the question of whether a particular enactment violates equal protection for want of proper classification is determined by a two-part inquiry. First, the Court must determine if the enactment's classifications are based on "natural distinguishing characteristics," and if so, whether they bear a reasonable relationship to the object of the enactment. *Alexander v. City of Detroit*, 392 Mich. 30, 43 (1974). Second, the Court must evaluate whether all persons of the same class are included or affected alike, or whether immunities or privileges extended to an arbitrary or unreasonable class while denied to others of like kind. *Id.*

Plaintiffs heavily rely on *Alexander* as support for its contention. In *Alexander*, the Michigan Supreme Court held a Detroit City ordinance to be unconstitutional because it improperly classified waste produced by 'multiple dwellings of more than four units' as "commercial waste." *Id.* at 34. In making this determination, the Michigan Supreme Court found that the City of Detroit did not incur "any greater expense in collecting refuse from multiple dwellings with 5 or more units than from condominiums or cooperatives." *Id.* at 35-6.

17

In addition, the Michigan Supreme Court found that City officials had not conducted a study or scientific analysis of the amount of refuse generated from such dwellings, and therefore could not justify the commercial waste classification. *Id.* at 36. In fact, the Court found, "there was no difference in the collection of refuse from condominiums and cooperatives on the one hand, and multiple dwellings of 5 units or more…" *Id.* at 35.

Here, again, while the matter at-hand shares factual similarities with *Alexander*, material differences also exist. Unlike in *Alexander*, the City has noted "natural distinguishing factors" that support its difference in treatment of residential properties classified as commercial for rate purposes. The City explains that those residential properties classified as "commercial" typically have structures and surfaces that prevent ground absorption. Therefore, storm water runoff, from such properties, runs into the City's sewers and thus requires more treatment. This treatment warrants higher rates, the City asserts. *See id.* at 38 ("[N]o demonstration was made by the City of the 'natural distinguishing characteristic' of increased expense for collection of refuse at properties included in the fee-generating portion of the ordinance as compared to the like class of excluded properties."). Whether this reasoning is credible is for a jury to decide.

Likewise, Plaintiffs have not sufficiently demonstrated whether the residential versus commercial classification of residential properties is unreasonable or arbitrary as a matter of law. Under this prong of the equal protection inquiry, the Court should review whether a distinction was made in name only. *See id.* at 39. The City has put forth evidence that classifying residential properties with more than four units as "commercial" was not an arbitrary exercise. *See* Foster Decl. ¶¶ 15-25. As mentioned above, the City explains that such residential properties typically share commercial properties that warrant the commercial classification. Reviewing these facts in a light most favorable to the City, Plaintiffs have not overcome its

burden in demonstrating that the City violated the Michigan Constitution's Equal Protection Clause.

## IV. CONCLUSION

For the reasons stated in this Opinion and Order, Plaintiffs' Motion for Summary Judgment [#61] is **DENIED**. In addition, Defendant's Motion for Summary Judgment [#64] is also **DENIED**.

**SO ORDERED**.


Dated: July 1, 2015        /s/Gershwin A Drain
                           HONORABLE GERSHWIN A. DRAIN
                           U.S. DISTRICT JUDGE